# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| RONALD BOASTON, | CASE NO. 3:22-CV-00854-SL |
| Petitioner, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN TOM WATSON, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

Petitioner Ronald Boaston, representing himself, filed a petition for a writ of habeas corpus on May 18, 2022. (ECF #1).[1] The District Court has jurisdiction over the petition under 18 U.S.C. § 2254(a). On May 23, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry of May 23, 2022).

On June 10, 2022, I ordered the parties to submit briefs on the timeliness of Mr. Boaston's petition. (ECF #5). Mr. Boaston responded on June 28, 2022 (ECF #6) and Respondent Warden Tom Watson (hereinafter, the State) responded on July 7, 2022 and included the State Court Record (ECF #7). On July 15, 2022, the State submitted the Return of Writ. (ECF #9). Mr. Boaston provided a Traverse to Return of Writ on August 18, 2022. (ECF #11).

---

[1]     Mr. Boaston's petition was docketed in this matter on May 23, 2022. But May 18, 2022 is the controlling date because "[u]nder the mailbox rule, a habeas petition is deemed filed when the prisoner gives the petition to prison officials for filing in the federal courts." *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002)

For the reasons discussed below, I conclude the petition is timely, but recommend the District Court **DISMISS** the Petition in its entirety. I further recommend the District Court **DENY** a Certificate of Appealability for all grounds for relief.

PROCEDURAL HISTORY

**Factual Findings of the Court of Appeals.** The Ohio Court of Appeals, Sixth Appellate District, set forth the facts of this case on direct appeal. These factual findings are presumed correct unless Mr. Boaston rebuts them by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Sixth District determined:

> {¶ 2} On the morning of February 15, 2014, Brandi Gonyer–Boaston was found dead in the hatchback of her Dodge Journey. Her vehicle was parked, engine running, more than 35 feet off a rural roadway in a snow-covered field in Fulton County, Ohio.

> {¶ 3} On April 21, 2014, the Lucas County Grand Jury returned a two-count indictment against Boaston: one count of aggravated murder in violation of R.C. 2903.02(A) and 2929.02, an unclassified felony, and one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unclassified felony.

> {¶ 4} At a trial by jury, the following evidence was adduced.

> {¶ 5} Brandi first met Boaston when she worked as a babysitter for Boaston's three children. In time, Brandi and Boaston began a relationship with each other and had two children together. They married in October 2005 and divorced in October 2006. Brandi became involved with another man and bore his child. A short time after Brandi's third child was born, Brandi and Boaston reentered into a relationship. They moved into an apartment with five of the six children (Boaston's two children from another marriage, the two children Brandi and Boaston share, and the child Brandi had with another man).

> {¶ 6} In 2013, Brandi finished nursing school and began working at Arbors of Waterville. There, she met co-worker Daron Walls–Jones. Brandi was flirtatious with Daron at work, by text, and by phone. In October of 2013, Boaston became aware of Brandi's relationship with Daron. From October of 2013 until her death in February 2014, Boaston installed three different types of spyware on Brandi's mobile

2

phone. The spyware allowed him to track her location, read her text messages, and listen to her telephone conversations.

{¶ 7} Sometime in late January or early February 2014, there was an incident involving Brandi and Boaston in the bathroom of the apartment they shared. A woman that lived next door to the family indicated that she heard running water and a woman's scream. She also felt a "vibration" through the shared wall.

{¶ 8} Boaston's son, W.B., was 16 at the time of Brandi's death. W.B. testified that one afternoon, a few weeks before Brandi died, he came home from school and saw Brandi walk out of the bathroom with a towel on her head. She "was purple with black eyes." It appeared to him as though Brandi had just gotten out of the bath or shower. W.B. explained, "from her head down she was purple and blue, looked like she had lack of oxygen. She showed me her shoulders and her arms and they were colored the same way as her face." She appeared "upset and scared." Over Boaston's objections, W.B. stated, "She told me that she was taking a bath, dad was just shaving, minding his own business, they were talking. Then out of nowhere, seemed like nobody was inside of his body anymore, he just pounced on her and tried to drown her." W.B. indicated that after the bathtub incident, Brandi started the process of moving out of the apartment. On February 3, 2014, Brandi and Boaston informed the children that they were separating.

{¶ 9} On the witness stand, Brandi's mother, Cindy Gonyer-Rumer, recalled seeing Brandi a few weeks before she died. Cindy had purchased a new pair of shoes for Brandi and insisted that Brandi come to her home to pick them up. When Brandi arrived, her face was hidden under the hood of her sweatshirt. Cindy insisted that Brandi put her head down. That is when Cindy noticed that Brandi's eyes were black and blue and her nose was a little crooked. Over Boaston's objections, Cindy explained:

> [Brandi] started crying and she told me that what happened was bad. So my thought was that he raped her and she said, no, it was worse than that. And I said, well, what could be worse than that? And she said, he tried to drown me. And I goes, what do you mean, he tried to drown you? And she goes, yeah, she goes, he asked me to take a bath with him, so I was in the tub, he was shaving his head. She goes, and I never seen this look on his face before and he jumped on me * * * She said that that—that he tried to drown her and she was fighting him off.

When asked to describe Brandi's demeanor at the time of the conversation, Cindy stated, "[Brandi] was really upset and she told me that he was gonna

3

kill her one of these days. And I said, then let's go to the cops or something, Brandi, you know. And she said, no, mom, I can't. She said, I won't be able to see my kids."

{¶ 10} Some of Brandi's co-workers also testified about statements Brandi made regarding the alleged bathtub incident. Judy Holmes testified that once every two weeks she worked the same shift as Brandi at Arbors of Waterville. Judy never saw any injuries on Brandi. However, she did recall a conversation she had with Brandi the day before she died wherein Brandi indicated that she was no longer with Boaston because "he tried to drown her in the bathtub."

{¶ 11} Shelby Hanes also worked with Brandi at Arbors of Waterville. Shelby recalled going into work one day—perhaps three to seven days before Brandi died—and noticing "what looked like popped blood vessels in her eyes * * * so it appear[ed] as though she had two black eyes." Brandi told Shelby that she received the injury by running into a door. Brandi asked Shelby to help her "cover the bruises" with make-up. Queen Anderson also worked with Brandi at Arbors of Waterville. Queen testified that she noticed a "mark" on Brandi's face on the day Shelby covered it with make-up. Queen could not remember where the mark was. She did, however, recall a conversation regarding the bathtub incident. Queen testified:

> [Brandi] told me that her and her husband had got into a disagreement or argument. * * * She didn't say what the argument was about, she said that she thought everything was fine between them, you know, that he ran her a bath water and she took a bath. She said she don't know what happened, what triggered him, but he came in the bathroom and he tried to hold her down in the tub. She said that that's when she was getting out of the tub—trying to get out and she hit her face. * * * But she didn't say anything about, you know, him hitting her or anything, she said that he was holding her down in the water and that's how she got the mark on her face.

{¶ 12} One of Boaston's friends also testified about the bathtub incident. Derek Wood testified that he and Boaston had been friends for 12 or 13 years. A few weeks before Brandi's death, Boaston told Derek that he and Brandi had gotten into an argument in their apartment bathroom. Derek explained:

> A. [Boaston] texted me and said, I fucked up.
>
> Q. And did he elaborate?

4

A. There was really no—too much elaboration via text message but he kind of just told me—kind of described the scenario of what happened. We talked about it more in person though. * * * That they were arguing in the bathroom and that she says that he held her under water and that she couldn't, you know, breathe for a few seconds and then he let her up and—but he said that he didn't remember doing anything like that to her and did not remember hitting her either.

{¶ 13} On Monday, February 3, 2014, Brandi placed her apartment key in Boaston's mailbox and packed some things in a tote. She began staying with her mother, Cindy.

{¶ 14} Despite what had occurred between Brandi and Boaston in the apartment bathroom, Brandi continued to see and communicate with Boaston on a daily basis. On numerous occasions, she went over to Boaston's apartment and helped him get the children ready for school and assist with the children's homework.

{¶ 15} On February 10, 2014, Brandi and her mother signed a rental application for a mobile home. Brandi listed her three children as dependents on the application.

{¶ 16} On February 12, 2014, Cindy received a phone call from her daughter. Brandi informed Cindy that Boaston was with her at Cindy's home. When Cindy arrived at her home a few minutes later, Boaston was standing on the porch holding the screen door ajar. Boaston followed Cindy into the home and shut the door. According to Cindy, Boaston started talking to Brandi and told her that either Brandi or Daron "was gonna pay." Despite the heated conversation, Brandi agreed to follow Boaston to Target to purchase Valentine's Day treats for the kids.

{¶ 17} Brandi worked her usual shift from 6:00 p.m. to 6:00 a.m., February 12–13, 2014. After work, Brandi went to Boaston's apartment to help get the children off to school. Brandi stayed alone with Boaston for six hours. Boaston later reported to a friend that he and Brandi had sex while they were alone together.

{¶ 18} Brandi worked from 6:00 p.m. to 7:00 a.m., February 13–14, 2014. While at work, Brandi made plans with co-worker Judy Holmes to go out to a club on Valentine's Day evening. From 8:34 p.m. on February 13, 2014 through 2:20 a.m. on February 14, 2014, Brandi and Daron exchanged 46 text messages, some of which were sexual in nature.

{¶ 19} Meanwhile on the evening of February 13, 2014, Mark Reno was hanging out with his friend, Matt Gwozdz. Matt and Boaston were friends. Sometime between 9–11:00 p.m., Boaston arrived at Gwozdz's home. When Reno headed towards the

door to leave, Boaston followed him. Boaston asked Reno if he could "get a gun" or knew anyone that could "take care of business." Reno asked Boaston if he needed him to "gather up the home boys and go take care of some shit." Boaston said "something like that, but deeper." Reno asked Boaston, "what do you want to do? You want to pistol whip him, put him in ICU or something, send a message to him?" According to Reno, Boaston looked down and shook his head. Reno testified, "it just didn't seem, real, I blew it off and left."

{¶ 20} Boaston called Reno at 2:51 a.m. The phone call lasted nearly eight and one-half minutes. According to Reno, Boaston had called him and asked him to "have lunch and talk." Reno indicated that he did not take Boaston's lunch invitation seriously and had no intention of speaking with Boaston again.

{¶ 21} At 4:05 a.m. Boaston filled his vehicle with gasoline. He then conducted two transactions at a nearby ATM.

{¶ 22} At 7:21 a.m. on February 14, 2014, Brandi went to McDonalds and purchased two breakfast sandwiches; one for herself and one for Boaston. Brandi made it to Boaston's apartment at about 7:30 a.m. Shortly thereafter, she and Boaston each ate one of the breakfast sandwiches. The kids finished getting ready for school. The last child boarded the school bus at 8:30 a.m.

{¶ 23} W.B. never heard from Brandi on the afternoon of February 14, 2014, even though Brandi had made plans to drive W.B. and his girlfriend to a local restaurant for an early Valentine's Day dinner. According to family members, it was unusual for Brandi to fail to follow through with plans she had made. W.B. became concerned about Brandi and telephoned Brandi's brother, Kevin Gonyer. Kevin tried to contact Brandi by phone, to no avail. Every time he called he heard a message that Brandi's voice mailbox was not set up.

{¶ 24} Kevin went to Boaston's apartment and asked Boaston to track Brandi down using the spyware installed on Brandi's phone. Boaston left the room for a few moments. When he came back, Boaston informed Kevin that Brandi's phone was not on.

{¶ 25} Kevin tried to call Brandi again. This time, he heard a message that the number he called was either changed or disconnected. Kevin went to Cindy's house. Cindy began calling Brandi's phone. She too heard a message that Brandi's number had been changed or disconnected. Cindy called Boaston to ask about Brandi. Boaston informed her that Brandi had stopped by the apartment after work, paid the gas bill, and gave him her debit card and pin number with instructions to spend the rest of

her paycheck on the kids. Boaston also informed Cindy that Brandi had showered and put her dirty work clothes back on before she left the apartment at 10:30 a.m. At the time, Cindy thought Boaston's statements were odd because Brandi was saving money for the mobile home. Brandi always purchased things for the children herself. Cindy also testified, and W.B. confirmed, that it was unusual for Brandi to put dirty clothes on after she showered. In fact, she often scolded the children when they did so.

{¶ 26} At 11:45 p.m. on February 14, 2014, Boaston called 911 to report Brandi's disappearance. Toledo Police Officer Martin Przybysz responded to the call. When the officer arrived at the apartment, Boaston invited him into the foyer. Boaston indicated that his ex-wife was not answering her phone and she was not at her mother's home. Boaston did not inform the officer that he had the ability to track Brandi's phone nor did he mention that Brandi's phone was turned off. Officer Przybysz characterized Boaston's demeanor as calm.

{¶ 27} Just before 8:00 a.m. on Saturday, February 15, 2014, hunters came across Brandi's vehicle parked in a snow-covered field in Fulton County, Ohio. One set of boot prints lead from the driver's side of the vehicle to the road. One of the hunters called his son, Matthew Smithmyer, a deputy with the Fulton County Sheriff's Office.

{¶ 28} When Deputy Smithmyer arrived at the scene, he noted two key fobs lying on the vehicle's front passenger seat. Officer Smithmyer opened the unlocked rear driver-side door and looked around. He then opened the rear hatch of the vehicle and found a woman's body wrapped in a clear plastic tarp. A shattered mobile phone was found on the roadway. The Bureau of Criminal Investigation was called in to process the scene.

{¶ 29} The Fulton County Sheriff's Department contacted the Lucas County Sheriff's Department who, in turn, contacted Toledo Police. Officers from each agency met at Toledo's detective bureau and discussed how to proceed with the investigation. Jeff Kozak, a detective with the Lucas County Sheriff's Department, went to Boaston's home and asked Boaston if he would be willing to go down to the bureau to speak with detectives about Brandi's disappearance. Boaston agreed. Boaston called Brandi's mother and asked her to come over to the apartment and get the kids. During the time they were waiting for Cindy to arrive, Boaston never asked the detective if they had found Brandi nor did he ask the detective whether he had any information about where Brandi might be. In Detective Kozak's opinion, Boaston appeared calm.

{¶ 30} Detective Kozak testified that when Cindy arrived to pick up the children, she was crying and begging for information about her daughter. At the time, Detective Kozak did not reveal any information about what had been found in Fulton County. Instead, he informed Cindy that they were "working on it." A few minutes after Cindy left with the children, Toledo Police Detectives arrived with a crime scene unit and a search warrant.

{¶ 31} Boaston arrived at the bureau just before 6:30 p.m. on February 15, 2014; detectives noted small scratches on Boaston's face and neck. Photographs of the injuries were presented to the jury. Boaston's coat had a 2.5 inch rip in the seam near the wound on his neck. Detectives found a glove in each pocket of Boaston's coat. One of the gloves had "a lot" of light brown human hair embedded in an outer Velcro strap and buckle. Forensic testing of the hair revealed that the DNA profile from the hairs was consistent with Brandi Boaston's DNA profile.

{¶ 32} Boaston's interview with police lasted from 6:30 p.m. on February 15, 2014, through 4:15 a.m. the following morning. The interview was recorded. Portions of the recording were redacted and the jury was shown over 4.5 hours of the interview.

{¶ 33} During the interview, Boaston told Detective Ryder that he withdrew $100 from the ATM at 4:07 a.m. on the morning of February 14, 2014, because he was "out with friends." He further indicated that he needed the money for gasoline. However, a receipt from the gas station indicates Boaston used a credit card to put $20 of fuel in his vehicle.

{¶ 34} Cell phone record analysis indicated that Brandi's cell phone utilized a tower near Delta, Ohio, at 11:15 a.m. February 14, 2014. Less than 15 minutes later, Brandi's cell phone utilized a tower near where her body was found. No signals were detected from Brandi's phone after 4:36 p.m. on February 14, 2014. During a critical time in the chronology of events (from 10:41 a.m. through 11:35 a.m.) Boaston's phone did not utilize any cell phone towers. At 11:36 a.m. Boaston's phone utilized a cell phone tower north and west of his home. Then, at 12:04 p.m., Boaston called Brandi's phone. A minute later, he texted her asking, "are you awake yet?" and "call me so we can go file taxes." He was in the vicinity of his apartment when the 12:04 call and 12:05 texts were made.

{¶ 35} Deputy Coroner Dr. Diane Scala-Barnett performed the autopsy on Brandi's body. At trial, Dr. Scala-Barnett described the injuries on Brandi's face and neck. Dr. Scala-Barnett opined that the manner of death was homicide by strangulation.

{¶ 36} After Brandi's death, Boaston appeared "calm, not caring" to some of his family members. One day, while watching the local news, Boaston commented to his son, "so far there's nothing going on with this investigation and hopefully there's nothing else and [the investigation into Brandi's death] should end soon." Boaston also said, "the evidence doesn't point towards anybody and the evidence doesn't point towards [me]."

{¶ 37} Boaston was found guilty of murder on both counts.

(ECF #7-1 at PageID 198-210; *see also State v. Boaston*, 100 N.E.3d 1002 (Ohio Ct. App. 2017) ("*Boaston I*"), *aff'd*, 153 N.E. 3d 44 (Ohio 2020)).

**State Court Conviction.** On April 21, 2014, a Lucas County grand jury indicted Mr. Boaston on one count of murder in violation of Ohio Revised Code §§ 2903.02(A) and 2929.02, and one count of murder in violation of Revised Code §§ 2903.02(B) and 2929.02. (ECF #7-1 at PageID 75-76). On April 30, 2014, Mr. Boaston was appointed counsel and pled not guilty. (*Id.* at PageID 78). He also filed a Motion for Investigative Assistance. (*Id.* at PageID 79-82). The trial court granted the motion on May 20, 2014. (*Id.* at PageID 83).

Mr. Boaston filed a Motion for Additional Funds for Expert Assistance on May 12, 2015. (*Id.* at PageID 90-91). The trial court granted that request on May 15, 2015. (*Id.* at PageID 92).

On September 23, 2015, the jury convicted Mr. Boaston on both counts. (*Id.* at PageID 94). At sentencing on September 28, 2015, the trial court merged the murder counts as allied offenses of similar import, and the State elected to proceed to sentencing on Count 1. (*Id.* at PageID 95-96). The trial court sentenced Mr. Boaston to 15 years to life imprisonment, of which 15 years is mandatory. (*Id.*).

**Direct Appeal.** On October 21, 2015, Mr. Boaston, through counsel, appealed his conviction and sentence to the Sixth District. (*Id.* at PageID 97-100). His merits brief raised seven assignments of error, as follows:

1.    The trial court erred by allowing the coroner to opine the victim's time of death based on the contents in her stomach.

2.    The trial court erred by allowing testimony insinuating that appellant's winter glove buckle matched and caused the bruise on the victim's chin.

3.    The trial court erred by allowing cell phone tower tracking evidence without establishing its scientific validity and reliability.

4.    The trial court erred by allowing other acts and hearsay evidence characterizing appellant as hostile toward the victim.

5.    The trial court erred by allowing prosecutorial misconduct when the prosecutor stated facts not in evidence during closing argument.

6.    The trial court erred by allowing an accumulation of errors that denied appellant's due process right to a fair trial.

7.    The trial court erred by not granting an acquittal pursuant to Crim. R. 29.

(*Id.* at PageID 106) (cleaned up). The State filed a responsive brief (*id.* at 146-95) and later a Notice of Additional Relevant Authority (*id.* at PageID 196). It appears Mr. Boaston filed a reply brief, but a copy was not included in the state court record. (*See id.* at PageID 787) (showing Reply Brief transmitted to the Sixth District on April 5, 2017). On December 1, 2017, the Sixth District affirmed the trial court's judgment in all respects. (*Id.* at PageID 198-230; *see also Boaston I*, 100 N.E.3d at 1005).

On December 11, 2017, Mr. Boaston filed a Motion for Reconsideration. (*Id.* at PageID 231-37). The State opposed. (ECF #7-1 at PageID 238-45). On January 23, 2018, the Sixth District denied the motion. (*Id.* at PageID 246-50).

Through counsel, Mr. Boaston appealed this decision to the Supreme Court of Ohio on March 9, 2018. (*Id.* at PageID 251-68). His Memorandum in Support of Jurisdiction raised a single proposition of law:

> In a criminal case, under Crim. R. 16(K), the proponent of expert testimony must provide a written report from the expert, outlining the anticipated nature of the expert testimony, to the opposing party no later than 21 days before trial. Failure to do so precludes admission of the expert's testimony. Crim. R. 12 does not require the opposing party to object before trial to enforce preclusion of the expert testimony.

(*Id.* at PageID 254). The State filed a Memorandum in Opposition. (*Id.* at PageID 277-92). On June 27, 2018, the Supreme Court of Ohio accepted jurisdiction. (*Id.* at PageID 293; *see also State v. Boaston*, 100 N.E.3d 445 (Ohio 2018) (table)). Mr. Boaston and the State each filed principal briefs (*id.* at PageID 294-88, 398-427), and Mr. Boaston submitted a reply brief (*id.* at PageID 428-37).

The Supreme Court of Ohio affirmed the Sixth District's judgment on March 26, 2020. (*Id.* at 438-70; *see also State v. Boaston*, 153 N.E.3d 44, 56 (Ohio 2020) ("*Boaston II*")). It held that the record "overwhelmingly establishes [Mr.] Boaston's guilt beyond any reasonable doubt." (ECF #7-1 at PageID 458).

Mr. Boaston moved for reconsideration on May 12, 2020 (*id.* at PageID 471-84) and the State opposed (*id.* at PageID 485-91). The Supreme Court of Ohio denied reconsideration on July 7, 2020. (*Id.* at PageID 492; *see also State v. Boaston*, 148 N.E.3d 586 (Ohio 2020) (table)).

**Post-Conviction Relief**. Meanwhile, on February 28, 2017, through counsel, Mr. Boaston filed a Petition for Post-Conviction Relief with the Lucas County Court of Common Pleas pursuant to Revised Code § 2953.21. (ECF #7-1 at PageID 493-516). On June 16, 2017, the State moved to dismiss or for summary judgment. (*Id.* at PageID 517-53). On October 16, 2017, the trial

11

court issued an Opinion and Judgment Entry with Findings of Fact and Conclusions of Law, determining that Mr. Boaston's petition was without merit. (*Id.* at PageID 554-66).

On November 14 and December 19, 2017, Mr. Boaston filed a Notice of Appeal and an Amended Notice of Appeal, respectively, from the October 16, 2017 trial court decision. (*Id.* at Page 567). On April 5, 2018, he filed a merits brief asserting two assignments of error, as follows:

1.    The trial court erred by dismissing Appellant's post-conviction relief petition without holding an evidentiary hearing.

2.    The trial court erred by not allowing court-appointed expert witness fees for Appellant to hire experts who would have helped him fully develop his claim for post-conviction relief.

(*Id.* at PageID 581, 585) (cleaned up). In response, the State moved to stay proceedings until the Supreme Court of Ohio decided Mr. Boaston's direct appeal. (*Id.* at PageID 626-28). On September 19, 2018, the Sixth District granted the State's motion and stayed all proceedings. (*Id.* at PageID 629-31).

Once the Supreme Court of Ohio decided Mr. Boaston's direct appeal, the State filed a brief in the Sixth District responding to Mr. Boaston's April 5, 2018 merits brief. (*Id.* at PageID 632-64). Mr. Boaston filed a Reply Brief on June 29, 2020. (*Id.* at PageID 665-74). On January 29, 2021, the Sixth District issued a Decision and Judgment, finding no post-conviction relief warranted. (*Id.* at PageID 677-703; *see also State v. Boaston*, No. L-17-1278, 2021 WL 463653 (Ohio Ct. App. Jan. 29, 2021) ("*Boaston III*").

On March 15, 2021, Mr. Boaston filed a Notice of Appeal to the Supreme Court of Ohio. (ECF #7-1 at PageID 704). His Memorandum in Support of Jurisdiction raised two propositions of law, as follows:

FIRST PROPOSITION OF LAW: It is not sound strategy, and therefore ineffective assistance of counsel, when trial counsel does not call an expert witness to rebut the State's expert witness when the State relies on expert testimony to prove its theory of the case and disprove the defendant's version.

SECOND PROPOSITION OF LAW: The mere allegation in a post-conviction relief petition that the defendant found an expert who contradicts the State's expert trial testimony is sufficient to trigger a hearing. It is a violation of Due Process when a court dismisses potential scientific testimony as "mere hypothesis" instead of holding a hearing to develop the scientific testimony from experts in the field to determine its evidentiary value.

(*Id.* at PageID 707). The State filed a Memorandum in Opposition to Jurisdiction (*id.* at PageID 724-41), and on May 25, 2021, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID 742).

### FEDERAL HABEAS CORPUS

Mr. Boaston filed this *pro se* petition asserting five grounds for relief, as follows:

**GROUND ONE**: Constitutional right to disclosure of evidence.

**Supporting Facts**: The State failed to provide an expert report from the deputy coroner's office 21 days before the criminal trial.

**GROUND TWO:** Due process of law.

**Supporting Facts**: The State violated Defendant's rights when it allowed testimony presented by Dr. Scala-Barnett insinuating that defendant's glove buckle matched & caused bruise on the victim. (2) Court allowed cell phone tower tracking evidence without establishing scientific validity & reliability. (3) Court allowed other acts & hearsay evidence characterizing defendant as hostile towards victim. (4) Court allowed prosecutor misconduct during closing argument. (5) Court allowed accumulation of errors. (6) The Court did not grant defendant acquittal under Crim. R. 29.

**GROUND THREE:** Effective assistance of counsel.

**Supporting Facts**: Trial counsel was ineffective due towards State presenting Dr. Barnett's opinion testimony without presenting prior disclosure.

**GROUND FOUR**: DNA evidence.

**Supporting Facts**: There was unknown DNA male profile found at scene of the crime that was on the victim's pants. Victim was found inside her car which also had Boaston male profile DNA, however Dr. Barnett failed to determine if the DNA was Mr. Boaston's or his son's. Both Boaston males were inside of the victim's car every day. Dr. Barnett gave her opinion, but never produced any scientific evidence to present in Court.

**GROUND FIVE**: Request for court-appointed expert witness fees.

**Supporting Facts**: The Defendant in this current cause was not given the chance to defend himself properly when the State of Ohio refused to grant him the assistance of an expert witness to prove or dispute the State's expert witness's testimony which was not scientific. The expert witness's failed to provide written reports which is damaging for the defense.

(ECF #1) (cleaned up).

STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr.

Boaston's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The

AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights"

and therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have

been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly

deferential standard for evaluating state-court rulings which demands that state-court decisions be

given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and

quotation omitted). Accordingly, an application for habeas corpus cannot be granted for a person

in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law as

determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

14

upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). For purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the state court decides a case differently than the Court has decided on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005), *cert. denied*, 549 U.S. 1047 (2006). The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Williams*, 529 U.S. at 405. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court decision involves an unreasonable application of the Court's precedent if the state court identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the state prisoner's case, or if the state court either unreasonably extends a legal principle from the Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. The appropriate measure of whether a state court decision unreasonably applied

clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under § 2254(d)(2), state court factual determinations stand unless they are objectively unreasonable in light of the evidence presented in state court. *Harrington*, 562 U.S. at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18.

Under federal law, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). Comity principles also require federal courts to defer to a state's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-129 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from

16

providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing *de novo* questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007).

### PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers, including exhaustion of state remedies and procedural default, limit a petitioner's access to review on the merits of a constitutional claim. *Daniels v. United States*, 532 U.S. 374, 381 (2001). Put simply, federal courts may review federal claims that were evaluated on the merits by a state court. Claims there were not evaluated on the merits, either because they were never presented to the state courts (*i.e.*, they are unexhausted) or because they were not properly presented to the state courts (*i.e.*, they are procedurally defaulted), are generally not cognizable on federal habeas review. *Bonnell v. Mitchel*, 301 F. Supp. 2d 698, 722 (N.D. Ohio Feb. 4, 2004).

**Exhaustion of Available State Court Remedies**. A court may not grant a petition for habeas corpus unless it appears the petitioner has exhausted available state court remedies, state corrective process is unavailable, or circumstances exist rendering such state process ineffective to protect the petitioner's rights. 28 U.S.C. § 2254(b)(1). Typically, the exhaustion requirement is

17

satisfied when the petitioner fairly presents all claims to the highest court in the state where petitioner was convicted, giving the state a full and fair opportunity to rule on the petitioner's claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). A claim is fairly presented when both the factual and legal basis for the claim has been introduced to the state courts. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2000). A failure to exhaust applies only where state remedies remain "available at the time of the federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). In contrast, where state court remedies are no longer available, procedural default (discussed more fully below), rather than exhaustion, applies. *Id.*

**Procedural Default**. Absent a petitioner demonstrating either cause and prejudice or that failure to review the claim would result in a fundamental miscarriage of justice (discussed below), a federal court will not consider the merits of procedurally defaulted claims. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

There are two avenues by which a petitioner's claim may be procedurally defaulted. *Id.* First, procedural default occurs if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.* To determine whether a petitioner's failure to comply with a state procedural rule bars review of his habeas claims, courts in the Sixth Circuit perform a four-pronged analysis: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and

that he was actually prejudiced by the alleged constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Second, a claim may be procedurally defaulted when the petitioner fails to raise it in state court and pursue it through the state's "ordinary appellate review procedures." *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848 (1991)); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). As addressed above, "[i]f, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id.* Although the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims barring federal court review. *Williams*, 460 F.3d at 806; *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022) (holding that when a state prisoner fails first to present a federal claim to the state court in accordance with state procedures, and the state court would dismiss the claim on that basis, the claim is procedurally defaulted on federal habeas review).

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749. Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced. *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005) (citing *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003) ("It is a settled appellate rule that issues

adverted to in a perfunctory manner, unaccompanied by some effort at a developed argumentation, are deemed waived.") (quotation omitted)). A finding of cause and prejudice does not entitle a petitioner to habeas relief; it only allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted. *See Martinez v. Ryan*, 566 U.S. 1, 10 (2012); *see also Coleman*, 501 U.S. at 750.

A showing of cause for the default requires more than the mere proffer of an excuse. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012). Furthermore, neither a petitioner's pro se status nor his ignorance of the law and procedural filing requirements are enough to establish cause to overcome procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004). Futility cannot constitute cause for the procedural default of a claim for failure to raise a claim on direct review if it means simply that a claim was "unacceptable to that particular court at that particular time." *Engle*, 456 U.S. at 130 n.35.

To demonstrate prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice; rather, the petitioner must show that the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. There is no prejudice where the petitioner does not show a reasonable probability of a different verdict. *Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003).

Alternatively, a petitioner may overcome procedural default by showing that a fundamental miscarriage of justice will occur if the claims are not considered. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 495. A fundamental miscarriage of justice occurs in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 495-96; *see also Schlup v. Delo*, 513 U.S. 298, 327 (1995). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A valid actual innocence claim must be supported by new reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial that is so strong a court cannot have confidence in the outcome of the petitioner's trial. *Schlup*, 513 U.S. at 324. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

**State Law Claims Not Cognizable on Federal Habeas Review.** The District Court will not have jurisdiction over a petitioner's claims for purposes of habeas corpus review if the claims do not "challenge the legality of his custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Indeed, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("A claim based solely on an error of state law is not redressable through the federal habeas process."). Moreover, merely asserting that a state law error violates the Federal Constitution is not sufficient to justify jurisdiction. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *see also Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state

21

procedural prescriptions, but the fundamental elements of fairness in a criminal trial.") (internal quotation omitted); *see also Engle*, 456 U.S. at 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (internal citation omitted).

Nonetheless, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process. *Williams*, 460 F.3d at 816. "[T]he category of infractions that violate fundamental fairness is defined very narrowly," and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (cleaned up). "A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (stating that a federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure). The habeas petitioner bears the burden of showing "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521.

ANALYSIS

Preliminarily, I conclude Mr. Boaston's petition was filed timely. Under AEDPA, a petitioner has one year to file a habeas corpus petition; that period begins to run from the latest of four events:

    (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

22

(C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Furthermore, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." *Id.* at § 2244(d)(2).

The Supreme Court of Ohio denied jurisdiction over Mr. Boaston's direct appeal on July 7, 2020. Mr. Boaston therefore had until October 5, 2020 to apply to the United States Supreme Court for a writ of certiorari. He did not do so. Applying § 2244(d)(1)(A), then, he had until October 5, 2021, to submit his petition to this Court. But under § 2244(d)(2), that deadline was tolled while his application for post-conviction relief remained pending. The Supreme Court of Ohio denied jurisdiction over that appeal on May 25, 2021, meaning Mr. Boaston had until May 25, 2022, to file his petition in this court. Accordingly, his petition – filed on May 18, 2022 – is timely. The State concedes as much in its brief on the timeliness issue. (ECF # 7 at PageID 58).

I now examine Mr. Boaston's grounds for relief.

I.      **Ground One must be dismissed because it is procedurally defaulted**.

In Ground One, Mr. Boaston asserts "[t]he State failed to provide an expert report from the deputy coroner's office 21-days before the criminal trial." (ECF #1 at PageID 5). His Petition does not indicate what federal constitutional right, if any, was violated. But his Traverse invokes *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Bagley*, 473 U.S. 667 (1985), *Kyles v. Whitley*,

23

514 U.S. 419 (1995) (ECF #11 at PageID 837-38), all of which relate to the government's

constitutional obligation to disclose *exculpatory* evidence. Further, he argues:

> In this case, the State violated the US & Ohio Constitutions by not disclosing Dr.
> Barnett's conclusion that Brandi Boaston died within two hours after eating. Further
> the State violated Crim. R. 16(K), which is designed to prevent due process violations
> by not presenting a written report by Dr. Barnett stating her scientific reasoning
> process her conclusion.

(*Id.* at PageID 838).

The State responds that Mr. Boaston did not fairly present this claim during his initial

direct appeal:

> While he raised a similar state law claim based on the State's alleged violation of
> Ohio Crim. R. 16(K) as his first issue in his direct appeal, [Mr.] Boaston did not alert
> the state courts to any potential constitutional claims regarding the non-disclosure of
> a supplemental Deputy coroner's report until his post-convictions petition, where
> the trial court properly found the issue barred by the doctrine of *res judicata.*

(ECF #7 at PageID 62). Further, the State maintains that Mr. Boaston committed a "second

default" by not raising his constitutional argument when he appealed the trial court's denial of his

petition for post-conviction relief. (*Id.* at PageID 62-63).

I agree with the State: this Court cannot consider the merits of Ground One because Mr.

Boaston did not fairly present it to the state courts during his direct appeal. As noted earlier, fair

presentment requires the petitioner have submitted to the state court the factual and legal basis

raised in the federal habeas claim. *See Fulcher*, 444 F.3d at 798. "General allegations of the denial

of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional

rights were violated." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000), *cert. denied*, 532 U.S.

958 (2001). Additionally, a petitioner may not raise claims in post-conviction proceedings that

could have been raised on direct appeal. *Engle*, 456 U.S. at 125 n.28. If an Ohio petitioner does not raise an available claim on direct appeal, that claim becomes procedurally defaulted. *Id.*

On direct appeal before the Sixth District, Mr. Boaston framed his attack on Dr. Barnett's testimony as a violation of Ohio Criminal Rule 16(K),[2] claiming he did not receive her report regarding the estimated time of the victim's death at least 21 days before trial. (*See* ECF #7-1 at PageID 119-24). For example, he posited: "[T]he trial court acted unreasonably in allowing the coroner, Diane Scala-Barnett, M.D., to render an opinion as to Gonyer-Boaston's time of death based on the contents in her stomach, especially since there was no written report to that effect." (*Id.* at PageID 119). He did not, however, frame this issue in terms of any federal constitutional principles, including but not limited to the right to exculpatory evidence under *Brady* and its progeny.

That argument was, however, squarely presented to the Sixth District in Mr. Boaston's post-conviction relief appeal:

> In this case, the State violated the U.S. and Ohio Constitutions by not disclosing Dr. Barnett's conclusion that Gonyer-Boaston died within two hours after eating. . . . Because there was no written report laying out Dr. Barnett's reasoning process, Boaston had no chance to duly scrutinize Dr. Barnett's conclusion and impeach her

---

[2]     This rule provides:

**Expert witnesses; reports**

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

Ohio R. Crim. P. 16(K).

testimony. It was impossible for trial counsel's expert to conduct a true expert analysis consisting of a scientific reasoning process when one was not conducted by Dr. Barnett. **If she did conduct such an analysis, it was not disclosed to Boaston, in clear violation of *Brady* under the *Bagley* case.** The autopsy report misled Boaston's defense because until 19 days before trial, trial counsel had no reason to engage an independent pathologist to examine time of death. This in turn violated Boaston's constitutional right of due process and fair trial. It would now only be fair to allow Boaston the opportunity the challenge the veracity of Dr. Barnett's opinion with his own expert opinion that can duly evaluate Dr. Barnett's theory, something that could not be done within 19 days before trial.

(ECF #7-1 at PageID 602-03) (emphasis added).

For the reasons explained above, presenting this argument during an appeal of the denial of post-conviction relief does not constitute fair presentment. I thus conclude this argument is procedurally defaulted. Furthermore, as the Sixth District concluded in *Boaston III*, *res judicata* also bars consideration of this argument. *See Boaston III*, 2021 WL 463653, at *9 ("Boaston and his trial counsel clearly knew about the state's belated disclosure of Dr. Scala-Barnett's time-of-death opinion . . . at the time of trial. But Boaston did not pursue the issue of a *Brady* violation in his direct appeal . . . . Therefore, his *Brady* claim is precluded by res judicata.").

Mr. Boaston's Petition and Traverse do not argue either (i) cause for the default and actual prejudice as a result of the alleged violation of federal law or (ii) that failure to consider the claims will result in a fundamental miscarriage of justice. As such, his procedural default of Ground One cannot be excused.

I therefore recommend the District Court **DISMISS** Ground One.

## II. Ground Two is also procedurally defaulted, requiring dismissal.

Ground Two of Mr. Boaston's petition amalgamates several claims:

The State violated Defendant's rights when it allowed testimony presented by Dr. Scala-Barnett insinuating that defendant's glove buckle matched & caused bruise on the victim. (2) Court allowed cell phone tower tracking evidence without establishing

26

scientific validity & reliability. (3) Court allowed other acts & hearsay evidence characterizing defendant as hostile towards victim. (4) Court allowed prosecutor misconduct during closing argument. (5) Court allowed accumulation of errors. (6) The Court did not grant defendant acquittal under Crim. R. 29.

(ECF #1 at PageID 7). Mr. Boaston appears to argue these errors deprived him of due process.

(*Id.*). His Traverse repeats some of these claims but does not further address accumulated errors or

the trial court's denial of his motion for judgment of acquittal. (*See* ECF #11 at PageID 839-41).

The State responds that these claims are procedurally defaulted. (ECF #7 at PageID 63-64).

It notes that these arguments track his second through seventh assignments of error in his direct

appeal to the Sixth District, which were as follows:

2.    The trial court erred by allowing testimony insinuating that appellant's winter glove buckle matched and caused the bruise on the victim's chin.

3.    The trial court erred by allowing cell phone tower tracking evidence without establishing its scientific validity and reliability.

4.    The trial court erred by allowing other acts and hearsay evidence characterizing appellant as hostile toward the victim.

5.    The trial court erred by allowing prosecutorial misconduct when the prosecutor stated facts not in evidence during closing argument.

6.    The trial court erred by allowing an accumulation of errors that denied appellant's due process right to a fair trial.

7.    The trial court erred by not granting an acquittal pursuant to crim. R. 29.

(ECF #7-1 at PageID 211) (cleaned up). The State further observes that after the Sixth District

affirmed the trial court's decision (thereby rejecting these assigned errors), Mr. Boaston abandoned

them and only raised a single assignment of error in his appeal to the Supreme Court of Ohio.

(ECF #7 at PageID 63-64).

The State is correct that each of these arguments is procedurally defaulted due to Mr. Boaston's failure to advance them before the Supreme Court of Ohio. It is a firmly established principle of habeas review that a defendant's decision during a later step of the appeal process to drop arguments advanced in a prior step of that appeal constitutes procedural default. *See, e.g., O'Sullivan*, 526 U.S. at 848 (noting that petitioner's "failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims"); *Mosley v. Petro*, No. 5:04CV726, 2006 WL 2640958, at *7 (N.D. Ohio Sept. 13, 2006) ("A petitioner procedurally defaults those claims that he fails to appeal to the Ohio Supreme Court.").

Once again, neither Mr. Boaston's Petition nor his Traverse argue either (i) cause for the default and actual prejudice as a result of the alleged violation of his process rights or (ii) that failing to consider these claims will result in a fundamental miscarriage of justice. As such, his procedural default of each claim embedded in Ground Two cannot be excused.

Finally, I note that in *Boaston I*, the Sixth District considered and rejected each of these arguments. *See Boaston I*, 100 N.E.3d at 1012-18. For the sake of brevity, I will not reprint the Sixth District's analysis here. It suffices to note that Mr. Boaston has not argued how, let alone convincingly demonstrated that, the Sixth District's analysis of any of these issues was factually or legally incorrect, and thus this Court must defer to the state court's determination of facts and its analysis of state law. Similarly, Mr. Boaston has not referenced any unreasonable application of binding United States Supreme Court precedent.

I therefore recommend the District Court **DISMISS** Ground Two.

28

III.    **Because Ground Three is also subject to procedural default, it too must be dismissed.**

In his Third Ground, Mr. Boaston asserts he received ineffective assistance of counsel. (ECF #1 at PageID 8). Specifically, he alleges his trial counsel was ineffective "due towards State presenting Dr. Barnett's opinion testimony without presenting prior disclosure." (*Id.*). He morphs the argument in his Traverse, saying:

> Petitioner contends that trial counsel was ineffective when requested funds for an expert in which the court denied. The Sixth District Court of Appeal issued an order barring this claim via res judicata, on January 29, 2021. This error by trial attorney has caused serious damage to petitioner's case.

(ECF #11 at PageID 842).

The State maintains this issue should have been presented during Mr. Boaston's initial direct appeal. (ECF #9 at PageID 820). Because it was not, the State maintains procedural default again applies. (*Id.*). It also notes that the Sixth District, in denying Mr. Boaston's motion for reconsideration, declined to address his ineffective assistance of counsel argument because it "was not separately assigned as error nor supported by case law as required by App.R. 16(A)." (*Id.*) (citing ECF #7-1 at PageID 249). The State further maintains that default results from Mr. Boaston's failure to raise the issue before the Supreme Court of Ohio, citing *O'Sullivan*, 526 U.S. at 847. (*Id.* at PageID 821).

I agree with the State that Ground Three is procedurally defaulted because it was neither fairly presented to the Sixth District in Mr. Boaston's direct appeal, nor to the Supreme Court of Ohio. Moreover, Mr. Boaston has not advanced any arguments as to why the procedural default should be excused, due to cause and prejudice or to avoid a fundamental miscarriage of justice.

The Sixth District did have occasion to examine the issues raised in Ground Three during Mr. Boaston's post-conviction appeal. It rejected those claims, explaining as follows:

{¶ 51} Boaston's second claim is that trial counsel provided ineffective assistance by failing to call experts to rebut Dr. Scala-Barnett's and Gast's testimony and failing to request that the trial court conduct a *Daubert* hearing to require Dr. Scala-Barnett to justify her time-of-death opinion and glove-buckle opinion. He argues that his ineffective assistance claims are not barred by res judicata because they depend on evidence outside of the record. He also contends that a trial court must presume that the factual allegations in a postconviction relief petition and any accompanying affidavits are true when determining whether to hold a hearing—which the trial court did not do in this case—and, when viewed in that light, his petition at least warranted an evidentiary hearing.

{¶ 52} Initially, we note that Boaston's contention that the trial court is required to presume the truth of the factual allegations in the petition and any accompanying affidavits is incorrect. In *Calhoun*, the Supreme Court specifically held that trial courts have the discretion to judge the credibility of affidavits submitted in support of postconviction relief petitions and do not have to accept the factual allegations in them as true. As the court stated, "[t]o hold otherwise would require a hearing for every postconviction relief petition."

{¶ 53} Turning to the merits of this argument, to prevail on a claim of ineffective assistance of counsel, the petitioner must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. Properly licensed Ohio lawyers are presumed to be competent, and there are "countless" ways for an attorney to provide effective assistance in a case, so "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" "[E]ffective assistance of counsel does not equate with a winning defense strategy * * *."

{¶ 54} To establish ineffective assistance of counsel, the petitioner must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"

{¶ 55} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel.

{¶ 56} The decision of whether or not to call an expert is generally considered a matter of trial strategy. Indeed, "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel."

{¶ 57} In its decision, the trial court found that Boaston's ineffective assistance claim was barred by res judicata because he raised an ineffective assistance claim in his direct appeal and the only evidence regarding trial counsel's ineffectiveness that he presented with his postconviction relief petition was Hanudel's affidavit "demonstrating only disagreement with trial counsel's strategy and tactics." Boaston argues that the information in Hanudel's affidavit—including his discussions with trial counsel and his consultations with experts—is evidence outside of the record that precludes the application of res judicata to his ineffective assistance claim.

{¶ 58} While we agree with Boaston that the information in Hanudel's affidavit is information that was not available for review in his direct appeal, we find that it is not sufficient to overcome the res judicata bar. This is because merely attaching evidence dehors the record to the petition will not guarantee a postconviction relief hearing. Rather, the evidence "'must meet some threshold standard of cogency' to advance the petitioner's claim beyond mere hypothesis."

{¶ 59} In his affidavit, Hanudel outlines his post-trial conversations with trial counsel, which show that trial counsel made certain tactical decisions that Hanudel might not agree with (such as choosing to cross-examine Dr. Scala-Barnett rather than requesting a continuance to try to find an expert to testify or filing a pretrial motion to have her time-of-death opinion and glove-buckle opinion excluded, and choosing not to present the cell tower tracking data expert because he did not believe the expert would be helpful), but that do not fall below an objective standard of reasonable representation. The trial court was within its discretion to find that Hanudel's hearsay statements regarding trial counsel's representation of Boaston and conversations with potential expert witnesses did not rise to the required "'threshold standard of cogency' to advance the petitioner's claim beyond mere hypothesis." Accordingly, we find that the trial court did not err by finding Boaston's ineffective assistance claim barred by res judicata.

{¶ 60} Additionally, we note, as the Supreme Court did, that there is substantial evidence in the record—apart from the testimony that Boaston contends was admitted because of trial counsel's ineffectiveness—that supported a finding that Boaston was guilty beyond a reasonable doubt.

{¶ 61} Because both of Boaston's constitutional claims are barred by res judicata, we find that the trial court did not err by denying the postconviction relief petition without a hearing. Accordingly, his first assignment of error is not well-taken.

*Boaston III*, 2021 WL 463653, at *10-11 (citations omitted).

31

Once again, Mr. Boaston has not argued the Sixth District's analysis of these issues was factually or legally incorrect, and thus this Court must continue to defer to the state court's determination of facts and its analysis of state law. Likewise, he has not referenced any unreasonable application of binding United States Supreme Court precedent.

I therefore recommend the District Court **DISMISS** Ground Three.

## IV. Ground Four must be dismissed because it too is procedurally defaulted.

In Ground Four, Mr. Boaston raises claims concerning DNA evidence from his trial. Specifically, he contends:

> There was unknown DNA male profile found at scene of the crime that was on the victim's pants. Victim was found inside her car which also had Boaston male profile DNA, however the Dr. Barnett failed to determine if the DNA was Mr. Boaston's or his son's. Both Boaston males were inside of the victim's car every day. Dr. Barnett gave her opinion, but never produced any scientific evidence to present in Court.

(ECF #1 at PageID 10).

The State maintains that these issues were not raised in Mr. Boaston's direct appeal to the Sixth District or his application for leave to appeal to the Supreme Court of Ohio, hence they are defaulted. (ECF #9 at PageID 821). The State also notes in passing that Ground Four is not cognizable in habeas (*id.* at PageID 820), though it fails to develop this argument in a meaningful way. As a result, I conclude the State's argument as to non-cognizability is waived. *See Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at a developed argumentation, are deemed waived.") (quotation omitted).

But this matters not, because the State is correct regarding procedural default. As was true with Ground Three, Mr. Boaston did not properly or fairly present this claim to the state courts

32

and thus denied those courts a full and fair opportunity to rule on the merits. Moreover, he has not argued to excuse the procedural default due to cause and prejudice or to avoid a fundamental miscarriage of justice.

I therefore recommend the District Court **DISMISS** Ground Four.

## V.     Ground Five must be dismissed due to procedural default.

Last, in Ground Five, Mr. Boaston argues:

> The Defendant in this current cause was not given the chance to defend himself properly when the State of Ohio refused to grant him the assistance of an expert witness to prove or dispute the State's expert witness's testimony which was not scientific. The expert witness's failed to provide written reports which is damaging for the defense.

(ECF #1 at PageID 12).

The record confirms, however, that Mr. Boaston's trial counsel twice requested the trial court grant funds for investigative and expert assistance. (*See* ECF #7-1 at PageID 79, 90). The trial court acceded to both requests. (*Id.* at PageID 83, 92). Factually, then, Mr. Boaston's argument is unsupported by the record.

Even if it were, however, Mr. Boaston did not present this claim during his direct appeal or in his memorandum in support of jurisdiction to the Supreme Court of Ohio. Once again, that means the claim is procedurally defaulted, and no attempt has been made to excuse that default. I also note that when he presented a claim concerning expert witness assistance during his post-conviction appeal, the Sixth District found the issue moot:

> {¶ 62} In his second assignment of error, Boaston argues that the trial court erred by finding that he was not entitled to funds to hire court-appointed experts. Because we have determined that the court did not err in denying the postconviction relief petition, we find that the issue of funds to hire experts is moot. Boaston's second assignment of error is not well-taken.

*Boaston III*, 2021 WL 463653, at *11.

I therefore recommend the District Court **DISMISS** Ground Five.

## VI.  Ineffective assistance of counsel does not save any of the procedurally defaulted grounds.

As a final matter, I note that under *Edwards v. Carpenter*, ineffective assistance of counsel may serve as cause to excuse a procedural default, but only if the ineffective assistance claim itself is not procedurally defaulted. 529 U.S. 446, 451-52 (2000). Mr. Boaston does not argue that any of his procedural defaults are saved under this exception, and my independent review of the record confirms that any such argument would fail in any event. Therefore, Mr. Boaston's procedural defaults remain unexcused.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability (COA) and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has determined a petitioner's constitutional claim to be without merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* A showing that the appeal would

34

succeed on the claim is not required to grant a certificate of appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Mr. Boaston has not made a substantial showing that he was denied any constitutional right. Jurists of reason would not find it debatable whether any of his asserted grounds for relief are valid claims of the denial of constitutional rights. Similarly, no procedural ruling appears to be in error. I therefore recommend the District Court not grant Mr. Boaston a COA with respect to any ground.

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons, I conclude Mr. Boaston's petition is timely. But I recommend the District Court **DISMISS** the petition in its entirety because all five grounds for relief are procedurally defaulted. I further recommend the District Court **DENY** a Certificate of Appealability as to all grounds for relief.

Dated: May 2, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl*, **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not**

merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).